In the United States District Court
for the Southern District of Georgia
Brunswick Division

FILED
U.S. DIST. COURT
BRUNSWICK DIV.
2005 JUL 27 P 3: 18

CLERK

| | | |
|---|---|---|
| PETE J. GODFREY, | : | CIVIL ACTION |
| Plaintiff, | : | |
| and | : | |
| LUMBERMAN'S UNDERWRITING ALLIANCE, | : | |
| Intervenor/Plaintiff, | : | |
| v. | : | |
| BUCKMAN LABORATORIES, INC., | : | |
| Defendant. | : | NO. CV203-137 |

### O R D E R

Plaintiff, Pete J. Godfrey, brought the above-captioned case against Defendant, Buckman Laboratories, Inc. ("Buckman"), asserting a negligence claim under Georgia law. Presently before the Court is Buckman's motion for summary judgment. Because genuine issues of material fact remain in dispute, the motion will be **DENIED**.

## BACKGROUND

In 1978, Godfrey began working as a welder at Gilman Paper Company's paperboard mill in St. Marys, Georgia. In late 1999, the mill was acquired by a Mexican paper company, Corporacion Durango S.A. de C.V., and the mill became known as Durango-Georgia Paper Company ("Durango").

In 1998, Buckman began supplying chemicals to the mill. One chemical that Buckman produced, and supplied to the mill, was Busan 1009. Busan 1009, a biocide,[1] is regulated and approved for use by the United States Environmental Protection Agency. The mill used Busan 1009 to control fungus and bacteria in the production of paper pulp products.

In August 2000, Patrick Low became one of Buckman's representatives working at Durango. Low was a former Gilman and Durango mill employee and, while with Buckman, he was at the mill on a regular basis. If Low was not at the mill, another Buckman representative was there, or one was available by phone.

At the mill, Busan 1009 was stored inside a container called a tote bin. Until 2001, the Busan 1009 tote bin was

---

[1] A biocide is a substance capable of destroying living organisms. American Heritage Dictionary of the English Language, New College Edition 133 (1976).

2

located in the "Jordan room"[2] at Durango. Busan 1009 was pumped from the tote bin through plastic tubing to a consistency regulator attached to the No. 2 paper machine, which was also located in the Jordan room.

In 2001, the roof of the Jordan room collapsed. Consequently, the Busan 1009 tote bin had to be moved to a more remote location, about seventy-five to one hundred feet from Machine No. 2's consistency regulator. From the new location, the Busan 1009 tubing was fastened to overhead pipes with tie wraps. Although the roof was repaired in mid-2002, due to space constraints, the Busan 1009 tote bin was not returned to the Jordan room.

One of Godfrey's supervisors at Durango was Mark Turner. On July 17, 2002, Turner directed Godfrey and several other Durango employees to replace Machine No. 2's "take off" roll, a machine component weighing about 500 pounds. When Godfrey and his co-workers went to the Jordan room, they saw that the plastic tubing would have to be removed from the consistency regulator to gain access to the take off roll. According to Godfrey, he did not know what was in the tubing at that time.

---

[2] A "Jordan" was a large refiner used to produce paper products at the mill. Godfrey Dep. 89.

The men contacted Turner to ask about removing the tubing. According to Turner, he asked Robert Johns, a Durango employee, to take care of this task, and stated that he believed that Johns would call Buckman to handle the matter because Durango employees were not supposed to work with hazardous chemicals supplied by Buckman.

Buckman asserts that it was never contacted about the need to move the tubing. The parties agree that one of Johns' coworkers in the production department, Don Aldridge, actually moved the tubing. According to Aldridge, who was the refinery operator of Machine No. 2, Turner made a direct request to him to move the tubing. Aldridge stated that he never attempted to contact any Buckman employee because he thought he was the right person to do the job.

During Aldridge's deposition, he testified that Buckman personnel knew that he had worked on the company's chemical lines in the past. Aldridge stated that he always told Buckman representatives when he worked on the lines, and that Buckman employees witnessed him performing such work. In particular, Aldridge stated that he had removed the Busan 1009 tubing from the consistency regulator once or twice a month for years. Aldridge explained that this was necessary because the end of

4

the tubing in the regulator was held in place by a lid, and the regulator vibrated, causing the end of the tubing to break, or fray. When this happened, Aldridge cut off the damaged part of the tubing, and reinserted the tubing into the regulator by taking slack out of the line.

Perhaps as a result of Aldridge's repair techniques, combined with the lack of a secure fastening mechanism, the tubing slipped out of the consistency regulator on a regular basis as the tubing was too short. Aldridge stated that he checked the tubing each day to make sure it was in its proper location. While Aldridge could not recall if he discussed this problem with Buckman personnel, he stated his actions would have been apparent to anyone looking at the frayed end of the tubing. Low testified that he knew that the end of the tubing was frayed where it went into the consistency regulator, and that he checked the meeting point of the tubing and the consistency regulator about every other day.

Aldridge also stated that tubing containing Buckman chemicals would often get pinhole size leaks, which caused the chemical to squirt out of the small holes in the tubing. On four or five occasions when this happened, Aldridge cut out the damaged section of tubing and replaced it with a fitting.

5

According to Aldridge, Buckman employees furnished him with fittings for such tasks when requested, without objection.

While Low admitted that he furnished Aldridge with fittings to repair Buckman lines, he declared that it was "specifically for non-biocide applications or non-hazardous applications[.]" Low Dep. 36. Although Low could not recall telling Aldridge not to work on biocide plastic tubing, he did state that he did not know of any Durango employees working on biocide lines at the mill. Further, Low remembered giving Aldridge safety admonitions when working around biocides: he advised Aldridge to wear gloves, a face shield, and other appropriate protective equipment.

During Aldridge's deposition, he represented that nothing spilled from the tubing when he removed it from the consistency regulator. Yet later in the deposition, Aldridge stated that he could not remember if Busan 1009 spilled from the tubing when he removed it from the consistency regulator. Aldridge testified that he placed the tubing behind a Jordan, in an open drain line, so the workers could do their job without coming into contact with the biocide. Aldridge admitted that he did not tell the workers what the chemical was, or where he placed the line.

Godfrey and his work crew were on break when Aldridge moved the tubing. After returning to the work site and seeing that the obstruction was gone, Godfrey and the others proceeded to remove the take off roll. Turner testified that when he came in to see how the job was going, he saw the biocide line in the area where the men were working, not in the drain line behind a Jordan. Turner stated that he saw the end of the tubing being lifted off the ground by the chain fall, a type of pulley mechanism that was being used to remove the take off roll.

Turner related that the floor of the Jordan room had water on it from a leaky piece of equipment, and that he saw a chemical, which he believed to be Busan, dripping out of the end of the tubing. Turner recalled that the chemical turned a milky white color when it came into contact with water on the ground, and stated that when he was helping operate the chain fall, his hands began itching, leading him to suspect that he had come into contact with the chemical. However, Turner's hand irritation resolved itself when he washed with soap and water at lunch.

Godfrey declares that he came into contact with Busan 1009 when he operated the chain fall with his bare hands. The chain

7

fall had some slack in it and was in contact with the floor while Godfrey was pulling on the chain. Godfrey did not know what was on the chain fall, or on the floor, before he operated the pulley.

According to Godfrey, he went to wash for lunch before the other men in the group. While he testified that he did not feel comfortable when he left the job site for lunch, he stated that he was not in much pain or discomfort, and he related that he did not yet know that he had been in contact with a dangerous chemical. When he washed his hands, he felt a stinging sensation on his hands and arms, and thought that he had an allergic reaction to the soap. Godfrey maintains that he did not consider the possibility that he had come into contact with a hazardous chemical. While working that afternoon, Godfrey continued to feel discomfort on his hands and arms. However, he did not go to the first aid office until a few hours later, when his work on the take off roll job was finished.

As a result of this incident, Godfrey sustained second-degree burns on his hands and forearms. Godfrey's hands and forearms are scarred, and he reports tingling, burning, numbness, poor circulation, and gripping difficulties since the

AO 72A
(Rev. 8/82)

time of the accident. Although he tried to go back to work at the mill after the accident, he was unable to do any work there. Godfrey has not worked anywhere else since he was injured.

**SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court must view the facts in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and must draw "all justifiable inferences in his favor. . . ", United States v. Four Parcels of Real Property, 941 F.2d 1428, 1437 (11th Cir. 1991)(en banc)(internal quotation marks omitted).

AO 72A
(Rev. 8/82)

**DISCUSSION**

To recover in a negligence action, a plaintiff must prove duty, breach of duty, causation, and damages. Shortnacy v. N. Atlanta Internal Med., P.C., 252 Ga. App. 321, 325 (2001). Godfrey argues that Buckman is responsible for Aldridge's negligent handling of the tubing, which caused his injury. The principal matter in dispute on this motion is whether the facts permit an inference that Aldridge was acting for Buckman when he moved the Busan 1009 tubing.

**I. Buckman May Be Responsible for Aldridge's Actions**

Absent any suggestion by the parties to the contrary, the Court presumes that Georgia law governs the existence, and scope, of the purported agency relationship. 3 Am. Jur. 2d Agency § 8 (2002). An agency relationship may be created when a principal gives an agent actual or apparent authority. Bennett v. Miller, 188 Ga. App. 72, 74 (1988). Actual authority is created by the words or conduct of the principal to the agent. Anderson v. Turton Dev., Inc., 225 Ga. App. 270, 274 (1997); Restatement (Second) of Agency § 26 (1958). Apparent, or ostensible, authority is created by the words or

10

conduct of the principal to a third party. Bennett, 188 Ga. App. at 74.

Because there is no allegation of reliance by Godfrey on Buckman's representations, Buckman may be liable only if it actually authorized Aldridge's actions. Also, Godfrey does not allege that Buckman expressly authorized Aldridge to move the tubing. Consequently, any actual authority must be implied from Buckman's words or conduct to Aldridge.

Buckman denies that Aldridge was its agent, emphasizing that Durango protocol called for Durango employees to contact Buckman when they needed to interact with any biocide. Buckman asserts that it was not obligated to keep Aldridge, who it characterizes as an independent third party, from harming Godfrey because no "special relationship" existed between it and Aldridge or it and Godfrey. Houston v. Bedgood, 263 Ga. App. 139, 141-43 (2003).

According to Godfrey, however, Aldridge was authorized to act on Buckman's behalf in this instance because, viewing the evidence in the light most favorable to him, Buckman employees: (1) furnished Aldridge with fittings to repair tubing containing Buckman chemicals, (2) witnessed Aldridge repairing Buckman tubing, (3) were told by Aldridge whenever he repaired

11

Buckman's chemical lines, (4) knew that the Busan 1009 tubing was broken or frayed where it entered the consistency regulator, (5) knew or should have known that the tubing had a tendency to come out of the consistency regulator due to its length and lack of a secure fastening mechanism, and (6) should have known that Aldridge was repairing the frayed end of the tubing, which involved removing and reinserting the Busan 1009 tubing into the consistency regulator on a regular basis.

Godfrey avers that Buckman recruited Aldridge to work around Buckman biocides and its transport lines at the mill. According to Godfrey, although Buckman accepted the benefits of Aldridge's work, it failed to give him any meaningful training regarding the proper handling of its chemicals. Plaintiff contends that Defendant's conduct put Aldridge in the position where he reasonably believed he was allowed to work with Buckman's biocide lines.

Whether Buckman knew of Aldridge's prior removal and relocation of the Busan 1009 tubing is disputed by the parties. Both parties agree that Aldridge did not tell Buckman that he was fixing the frayed end of the tubing, which required removing it from the consistency regulator. Yet, Aldridge testified that it would be obvious that this was being done

AO 72A
(Rev. 8/82)

upon examination of the end of the tubing, and Low acknowledged that he checked this area about every other day, and that he realized that the end of the tubing was fraying.

These facts constitute sufficient circumstantial evidence upon which the jury could infer that Buckman knew about Aldridge's removal of the Busan 1009 tubing from the consistency regulator. Based on Aldridge's past history of working on Buckman lines, and the company's knowledge, and acquiescence or encouragement of his activity, the jury may infer that Buckman authorized Aldridge to undertake removal of the line, or that Aldridge reasonably believed that he was authorized to do so.

The extent of Buckman's knowledge and authority is not the only factual dispute between the parties. To establish an agency relationship, Godfrey must also satisfy the finder of fact that Aldridge was acting for Buckman, rather than Durango, when he moved the tubing. An agent is a fiduciary of the principal, and must consent to the agency relationship. Smith v. Merck, 206 Ga. 361, 368 (1950); Restatement (Second) of Agency § 1(1) (1958). During Aldridge's deposition, he stated that he believed he was the appropriate person to remove the Busan 1009 tubing. Aldridge Dep. 12-13. Based on the

13

circumstances presented in the instant case, the factfinder could conclude that Aldridge was acting on Buckman's behalf.[3]

If the jury determines that the conduct of Aldridge and Buckman established an agency relationship, and that Buckman's conduct amounted to implicit authorization for Aldridge's actions, then Buckman may be responsible for any negligence by Aldridge.

## II. Buckman May Have Been the Proximate Cause of Godfrey's Harm

> Proximate cause is that which, in the natural and continuous sequence, unbroken by other causes, produces an event, and without which the event would not have occurred. Proximate cause is that which is the nearest in order of responsible causes, as distinguished from remote, that which stands last in causation, not necessarily in time or place, but in causal relation.

Council of Superior Court Judges of Georgia, Suggested Pattern Jury Instructions: Vol. I, Civil Cases, 3d ed. 231 (revised Apr. 1997).

Buckman contends that any act of negligence on its part was not the proximate cause of Godfrey's injury because

---

[3] See, e.g., Bennett, 188 Ga. App. at 74; Citibank, N.A. v. Data Lease Fin. Corp., 828 F.2d 686, 691 (11th Cir 1987)(recognizing that, under Florida law, "the agency relationship may be inferred from circumstantial evidence or implied from a course of dealings . . . even when the principal and agent deny the relationship.").

14

Aldridge's independent acts of negligence were intervening and superceding causes. However, if the jury concludes that Buckman is responsible for Aldridge's actions, his acts would not be intervening or superceding causes.

Buckman also maintains that Godfrey's own negligence was the proximate cause of his harm. Defendant contends that Turner, when he saw the tubing caught in the chain fall, directed Godfrey to cease work and wash because he realized that Godfrey had come into contact with a caustic chemical. Buckman alleges that Godfrey ignored these directions, had lunch, and then worked on the chain fall again with bare hands. Moreover, Defendant asserts that Godfrey then put on welding gloves and performed additional tasks, locking any residual chemical into his skin. Defendant maintains that Plaintiff was negligent in failing to follow his supervisor's directions, and that his negligence was an intervening and superceding cause that relieves Buckman of liability.

Yet, Godfrey denies that he was ever directed to wash by Turner, or even warned that he might have come into contact with a dangerous chemical. Consequently, Defendant's intervening and superceding cause argument regarding Godfrey's purported negligence involves a factual dispute between the

15

parties. If the factfinder credits Defendant's version of events, it may escape liability, but the Court cannot find that it is entitled to judgment as a matter of law on that basis.

### III. Godfrey Did Not Assume the Risk of Injury as a Matter of Law

Buckman argues Godfrey assumed the risk of injury because he had been burned by Busan 110, also a caustic chemical, on a prior occasion under similar circumstances. Apparently, Godfrey's welding cords had been dragged through Busan on the floor of the Jordan room, and he then handled the cords, causing some injury. Accordingly, Buckman contends, Godfrey should have known better than to work on the chain fall in the Jordan room without wearing gloves.[4] McCurley v. Whitaker Oil Co., 193 Ga. App. 527, 528-31 (1989).

Godfrey argues that he did not assume the risk of injury because he had no actual knowledge of the dangerous situation, and he could not appreciate the risk of the substantial burns

---

[4] Buckman also asserts that Godfrey assumed the risk of injury by failing to take proper remedial measures after coming into contact with the chemicals. However, Godfrey denies that he was directed to wash by a supervisor, or that he realized he had been exposed to a biocide at the time of coming into contact with it. Viewing the evidence in the light most favorable to Godfrey, the Court cannot find that he assumed the risk of injury based on his delay in seeking medical treatment or failure to care for the exposure promptly.

he sustained. Godfrey reported that, on the day of his injury, the men were sweating heavily while they worked. As a result, it was difficult to discern that the chain fall was wet when he handled it, other than from his own sweat. Godfrey also argues that he did not assume the risk of injury because Buckman did not notify him that he had handled a dangerous chemical, with a warning label on the tubing explaining the kind of fluid it contained, or otherwise.[5]

> The affirmative defense of assumption of the risk bars a plaintiff from recovering on a negligence claim if it is established that he 'without coercion of circumstances, chooses a course of action with full knowledge of its danger and while exercising a free choice as to whether to engage in the act or not.' In Georgia, a defendant asserting an assumption of the risk defense must establish that the plaintiff (1) had actual knowledge of the danger; (2) understood and appreciated the risks associated with such danger; and (3) voluntarily exposed himself to those risks.
>
> 'Knowledge of the risk is the watchword of assumption of risk,' and means both <u>actual</u> and <u>subjective</u> knowledge on the plaintiff's part. The knowledge that a plaintiff who assumes a risk must subjectively

---

[5] Defendant asserts that state law claims based on inadequate labeling of pesticides are preempted by the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), codified at 7 U.S.C. §§ 136-136(y). <u>Bates v. Dow Agrosciences LLC</u>, 161 L. Ed. 2d 687 (2005). However, Godfrey has stated that his allegation that the tubing was not labeled in the vicinity where he was working is relevant only as a rejoinder to Buckman's assumption of the risk defense. As much as Plaintiff disclaims any state law cause of action based on the alleged failure to warn, Buckman's suggestion, that Godfrey's failure to warn claim is preempted by federal law, is moot. Doc. No. 65 at 14.

possess is that of the specific, particular risk of harm associated with the activity or condition that proximately causes injury. The knowledge requirement does not refer to a plaintiff's comprehension of general, non-specific risks that might be associated with such conditions or activities.

Vaughn v. Pleasent, 266 Ga. 862, 864 (1996)(quoting Beringause v. Fogleman Truck Lines, Inc., 200 Ga. App. 822, 823, 824 (1991))(footnotes omitted).

Thus, the previous exposure to a different Buckman chemical, which did not result in severe, permanent injury, is not sufficient to establish assumption of the risk in the instant case, as a matter of law.

## CONCLUSION

For the reasons explained above, Defendant's motion for summary judgment is **DENIED**. See Doc. No. 50.

**SO ORDERED**, this 27th day of July, 2005.

_____
JUDGE, UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)